Filed 12/22/23  P. v. Hsu CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>MICHAEL ROE CHIEN HSU,<br><br>　　　Defendant and Appellant. | B319181<br><br>Los Angeles County<br>Super. Ct. No. SA097779 |

　　　APPEAL from an order of the Superior Court of Los Angeles County, Upinder S. Kalra and Lauren Weis Birnstein, Judges.  Affirmed.

　　　Werksman Jackson & Quinn and Kelly C. Quinn for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

The police arrested Michael Roe Chien Hsu after he poured a liquid containing MDMA into a woman's wine glass while she was in the restroom.  The government suspected Hsu intended to assault the woman sexually, and it obtained warrants to search his phone on the basis that it might contain evidence of other sexual assaults.  After initially struggling to bypass the phone's security, the government eventually unlocked the phone and discovered photographs and videos apparently showing Hsu sexually assaulting an unconscious woman.  Based on those discoveries, the People charged Hsu with multiple counts of sexual assault.

Before the preliminary hearing, Hsu moved to suppress the evidence seized from his phone.  The magistrate denied the motion and held Hsu to answer.  After a court denied his motion to set aside the information, Hsu agreed to a plea deal, under which he pleaded guilty to a single count of sexual penetration by foreign object.  The court placed him on formal probation for eight years.

On appeal, Hsu challenges the denial of his motion to suppress.  He argues the magistrate should have granted the motion because the government failed to comply with the particularity and notice requirements of California's Electronic Communications Privacy Act (CalECPA) (Pen. Code, § 1546 et seq.).[1]  Alternatively, he argues the government did not have lawful possession of his phone and unreasonably delayed obtaining the search warrant, there was not probable cause to search his phone, and the warrant contains material

---

[1]    Unless noted, undesignated statutory references are to the Penal Code.

misrepresentations and omissions.  We reject Hsu's arguments and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The arrest*

On May 26, 2016, Hsu was at a restaurant drinking wine with L.U.  Hsu and L.U. were coworkers and had been in a casual sexual relationship for about a year.  Recently, L.U. had met a new partner, and she was starting to " 'pull away' " from Hsu.

At some point, L.U. left the table to go to the restroom.  Three people sitting nearby noticed Hsu holding a small glass object containing a white substance.  Hsu looked from side to side, poured the substance into L.U.'s wine glass, and then slid the glass toward her end of the table.  The witnesses informed the restaurant's security, who called the police.  One of the witnesses also ran to the restroom and told L.U. what she had observed.  Although L.U. was shocked, she returned to the table and pretended not to know what Hsu had done.  Hsu tried to make a toast with L.U., but she refused to drink the wine.

Santa Monica Police Department officers arrived at the restaurant and arrested Hsu.  They searched Hsu and seized his iPhone.  The officers found three small glass vials in Hsu's pocket, two of which were filled with liquid.  Hsu told police the vials contained liquid vitamins that he used to help him sleep.  However, lab tests revealed the vials and L.U.'s wine glass contained MDMA.  L.U. denied having given Hsu permission to put MDMA in her drink.

L.U. told police she sometimes felt nauseous after spending an evening with Hsu.  She recounted attending two concerts with Hsu in the past.  Both nights she consumed drinks that Hsu had

given her, after which she felt " 'amazing' " and " 'on top of the world.' "  One of those nights she jokingly told Hsu she thought he had " 'drugg[ed] [her]' " because she felt so good, which Hsu denied.  After the concerts, L.U. felt "super tired" and wanted to sleep as soon as she returned to Hsu's home.  According to L.U., Hsu had shown her pictures of them kissing in public at one of the concerts, which surprised her because it was not her normal behavior.

## 2.  *The government searches Hsu's digital devices*

Shortly after arresting Hsu, the government obtained a warrant to search his home and vehicle (Warrant One).  During that search, the police seized a computer and several other digital devices.

About a month later, on June 30, 2016, the government sought a warrant to search Hsu's digital devices, including a phone seized during his arrest (Warrant Two).  In support of the warrant, the government submitted a five-page affidavit of probable cause from Detective Nicole Sierra.[2]

In the affidavit, Sierra summarized the May 26 incident at the restaurant and said she believed Hsu was attempting to drug L.U. in order to assault her sexually.  Sierra also said she believed Hsu may have drugged and sexually assaulted other victims.  According to Sierra, Hsu's digital devices might contain evidence of his crimes because those "involved in these types of crimes will at times photograph or record their crimes for

---

[2]     At some point during the case, Sierra married and changed her last name to Murphy.  For the sake of clarity, we refer to her only by her original surname, Sierra.

4

the purpose of keeping a momento or 'reliving' the sexual assault at a later date."

A magistrate found probable cause to search Hsu's devices and issued Warrant Two.  The police attempted to search Hsu's phone, but they could not unlock it.  However, the police were able to search Hsu's other digital devices, on which they apparently discovered evidence that he had sexually assaulted L.U.  Based on that evidence and the incident at the restaurant, the People charged Hsu with several crimes, including poisoning (§ 347, subd. (a)) and sexual penetration by foreign object (§289, subd. (d)).

### 3. *Hsu moves to suppress evidence from his devices*

Hsu moved for an order returning his property—including his phone—on the basis that it was neither evidence nor contraband.  The court ordered the government to return "all previously imaged electronic devices" seized from Hsu.  The police did not return Hsu's phone because they had not been able to unlock it to create an image.

A few months later, in September 2016, Hsu moved to quash Warrant One and Warrant Two, suppress all evidence seized under the warrants, and return his property.  The court granted the motion in part, finding the warrants lacked sufficient probable cause.  The court explained that, although the magistrate properly found people who sexually assault victims may retain evidence in photographs and recordings, the affidavit contained insufficient facts to support an inference that Hsu intended to assault L.U. or anyone else.  The court noted the affidavit stated MDMA is a Schedule I narcotic, but it failed to describe its effects, how it is used, and who uses it.  Therefore, it failed to address the central issue:  whether those

5

who commit sexual assaults or drug-facilitated sexual assaults use MDMA and, if so, how.

The court deferred ruling on Hsu's motion to return his property, and it explicitly stated it was not ordering the return of the property at that time. The court noted it had discussed this issue with the parties at the bench, and it asked Hsu if he had anything to add to the record. Hsu did not object or urge the court to issue a ruling. Instead, he asked the court if it would allow a special master to "go through the electronic devices" if the parties reached an agreement on the issue. The court said it would not interfere with the parties' agreement.

After the court suppressed the evidence from Hsu's digital devices, the People dismissed all the charges except a single count of poisoning.

4. ***The government successfully searches Hsu's phone***

In February 2017, the government obtained a new warrant to search Hsu's phone. Once again, however, the police were unable to unlock the phone to search it.

After learning of a new method that could unlock Hsu's model of iPhone, the government sought a new warrant to search his phone in October 2017. The parties refer to this warrant as "Warrant Five," so we do the same. The government also requested an order delaying notification of the warrant, citing the possibility that Hsu could flee or remotely wipe his phone.

The government supported Warrant Five with a 13-page affidavit drafted by Detective Sierra. Compared to the affidavit supporting Warrant Two, Sierra included in this affidavit significantly more information related to MDMA, the characteristics of sexual predators, and the basis for believing Hsu's phone might contain evidence of sexual assaults.

The affidavit states MDMA "can . . . be used and [is] known as one of the 'date rape drugs.' "  It is "an illegal narcotic that is commonly used by perpetrators of sexual assault because it [a]ffects the mind of the user in a fashion that can render them incoherent."  MDMA belongs to the hallucinogen category of drugs, a category with "indicators" that include "memory loss, nausea, body tremors, dazed appearance, difficulty with speech, disorientation, flashbacks, hallucinations, paranoia, perspiration, piloerection, poor perception of time and distance, and synesthesia."  MDMA is commonly used "to enhance one's senses so one can have increased positive and arousing responses to touch, smell and vision."  L.U. reported feeling euphoric, wanting to be touched, experiencing nausea, and suffering memory loss while with Hsu, which were consistent with having been under the influence of MDMA.

Under the heading, "Characteristics of Sexual Predators," the affidavit states "perpetrators of sexual assault commonly will drug their victims to make it easier to sexually assault them while they are incoherent so as to reduce the likelihood of being caught."  In addition, "[p]erpetrators of sexual assault who assault their victims while they are incoherent typically do so through supplying drugs secretly to a drink or through other means of intoxication.  These drugs render the victim incoherent and allow[ ] the suspect to forcibly assault their victims with little to no resistance."  Further, sexual predators "commonly collect trophies such as clothing, videos and photographs of their sexual assault experiences, commonly found on their cellular phone devices and other electronic devices."

The affidavit concludes Hsu "could potentially be a sexual predator with a proclivity to assaulting women who have been

drugged." Further, "like other likeminded individuals, [Hsu] is likely to have evidence of his assaults on his cellular phone."

A magistrate found the affidavit established probable cause to search Hsu's phone, and it issued Warrant Five on October 19, 2017. The magistrate also ordered delayed notification of the warrant.

The police successfully unlocked Hsu's phone and discovered photographs and videos of L.U. that appeared to have been taken without her knowledge. The photographs and videos showed L.U. dressing and undressing, L.U. passed out while Hsu used his hand to reveal her anus and vagina, and Hsu digitally penetrating L.U.'s vagina and anus.

### 5. *Hsu's motions related to Warrant Five*

Based on the evidence obtained from Hsu's phone, the People filed a new case against him alleging several counts of sexual penetration with a foreign object (§ 289, subds. (d), (e)).

Before the preliminary hearing on the new case, Hsu moved to quash Warrant Five and suppress evidence obtained from his phone. He argued the warrant was not supported by probable cause, the scope of items to be searched exceeded the probable cause statement, and the warrant failed to comply with CalECPA's particularity and notice requirements. Hsu also moved to traverse the warrant, arguing it contained misleading statements and omissions concerning MDMA and the prior warrants.

The same magistrate who quashed Warrant Two heard Hsu's motions concerning Warrant Five. The magistrate considered the motions at the preliminary hearing, which it conducted over the course of several days.

8

Although Hsu did not raise the issue, the magistrate asked the parties to submit briefs addressing whether Warrant Five relies on suppressed evidence. The magistrate expressed concern that the affidavit potentially refers to photographs the People had obtained from Hsu's computer, which the magistrate had suppressed.

After receiving the supplemental briefs, the magistrate denied Hsu's motions and held him to answer the charges. The magistrate noted the affidavit supporting Warrant Five was "much more detailed" than the affidavit supporting Warrant Two. It concluded the "details [of] the citizen[ ] informants' observations of Mr. Hsu's pouring MDMA into the victim's drink . . . . coupled with the victim's recitation of her past experiences with Mr. Hsu and the expert's and the affiant's description of the manner in which sexual assaults may be accomplished through the secret drugging of victims with substances like MDMA sufficiently establish that Mr. Hsu[ ] falls within the class of offenders who surreptitiously drug victims in order [to] incapacitate the victims to sexually assault them."

6.    ***Hsu's section 995 motion***

In September 2019, Hsu moved to set aside the information under section 995. He argued the government unlawfully obtained evidence from his phone, without which the People lacked sufficient evidence to hold him to answer the charges.

Hsu's section 995 motion repeated many of the arguments he raised in connection with his motions at the preliminary hearing, including that the affidavit relies on suppressed evidence. Hsu alternatively argued the government was not in lawful possession of his phone when it conducted the search. According to Hsu, section 1538.5 required the government to

return his phone within 10 days of the order granting his motion to quash Warrant Two. Hsu also argued the government's prolonged retention of his phone with "no 'persuasive justification' " violated his Fourth Amendment rights.

At a hearing on the motion, the court allowed the People to present testimony from Detective Sierra and Detective Monique Carrillo concerning whether Warrant Five relies on suppressed evidence. After hearing the testimony, Hsu seemed to concede the issue, noting it had "become clear" the relevant photographs did not come from his computer.

The court denied Hsu's motion in substantial part. It found the government lawfully possessed the phone, the delay in obtaining Warrant Five was reasonable, the warrant complies with CalECPA's requirements, the affidavit establishes probable cause for the search, and the affidavit does not rely on suppressed evidence.

## 7. *Plea and sentencing*

After the court denied the section 995 motion, Hsu and the People reached a deal under which Hsu pleaded guilty to a single count of sexual penetration while the victim was prevented from resisting by an intoxicating or controlled substance (§ 289, subd. (e)). The court suspended imposition of sentence and placed Hsu on probation for eight years. The court dismissed the remaining counts on the People's motion in the interests of justice. Hsu timely appealed.

## DISCUSSION

## 1. *Standard of review*

The parties disagree about the standard of review on appeal, which stems from their disagreement about the nature of the motion Hsu filed to challenge the magistrate's denial of

10

his motion to suppress. Hsu insists he challenged the decision by filing a motion to set aside the information under section 995 (995 motion). The Attorney General contends that, although labeled a 995 motion, Hsu's motion in substance was a renewed motion to suppress under section 1538.5, subdivision (i). The proper standard of review on appeal depends on our resolution of this dispute.

When a magistrate denies a motion to suppress at the preliminary hearing, the defendant has several avenues to challenge the decision. If the defendant is held to answer, one option is to file a 995 motion in the "superior court to set aside the information for lack of probable cause on the ground that the evidence is the product of an illegal search." (*People v. Gephart* (1979) 93 Cal.App.3d 989, 995–996 (*Gephart*).) "In a proceeding under section 995, the superior court's role is similar to that of an appellate court reviewing the sufficiency of the evidence to sustain a judgment. [Citations.] The superior court merely reviews the evidence; it does not substitute its judgment on the weight of the evidence nor does it resolve factual conflicts." (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529 (*McDonald*).)

The defendant also may challenge the magistrate's decision by filing a renewed motion to suppress at a special hearing in the superior court. (*Gephart, supra*, 93 Cal.App.3d at p. 996; § 1538.5, subd. (i).) Unless otherwise agreed to by the parties, "evidence presented at the special hearing shall be limited to the transcript of the preliminary hearing and to evidence that could not reasonably have been presented at the preliminary hearing, except that the people may recall witnesses who testified at the preliminary hearing." (§ 1538.5, subd. (i).) The superior

11

court is bound by the magistrate's findings "as to evidence or property not affected by evidence presented at the special hearing." (*Ibid.*) As to all other issues, the superior court "sits as a finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences." (*People v. Laiwa* (1983) 34 Cal.3d 711, 718 (*Laiwa*).)

The standard of review on appeal depends on whether Hsu filed a 995 motion or a renewed motion to suppress under section 1538.5, subdivision (i). "On appeal from a section 995 review of the denial of a defendant's motion to suppress, we review the determination of the magistrate at the preliminary hearing. [Citations.] We must draw all presumptions in favor of the magistrate's factual determinations, and we must uphold the magistrate's express or implied findings if they are supported by substantial evidence." (*McDonald, supra*, 137 Cal.App.4th at p. 529.) Although we defer to the magistrate on factual issues, we independently determine whether the search was reasonable. (*Price v. Superior Court* (2023) 93 Cal.App.5th 13, 34.)

In contrast, on appeal following the denial of a renewed motion to suppress, we review the superior court's decision at the special hearing. (*People v. Superior Court (Cooper)* (2003) 114 Cal.App.4th 713, 717.) In that case, "all presumptions are drawn in favor of the factual determinations of the superior court and the appellate court must uphold the superior court's express or implied findings if they are supported by substantial evidence." (*Laiwa, supra*, 34 Cal.3d at p. 718.)

Here, the record shows Hsu intended to file, and did in fact file, a motion to set aside the information under section 995. In addition to the fact that Hsu's motion explicitly states it is a 995 motion, Hsu did not seek to present new evidence in the superior

court, which is the defining characteristic of a renewed motion to suppress. Although the superior court permitted the *People* to present new evidence at the hearing, that does not transform the nature of *Hsu's* motion. Because we conclude Hsu's appeal challenges the magistrate's denial of his motion to suppress, we will review the magistrate's decision directly. (*McDonald, supra*, 137 Cal.App.4th at p. 529.)

**2.     *Warrant Five satisfies CalECPA's particularity requirements***

Effective January 1, 2016, CalECPA specifies the conditions under which the government may access electronic information from a service provider or the owner of an electronic device, such as an iPhone. (See § 1546 et. seq.; Sen. Bill No. 178 (2015–2016 Reg. Sess.) § 1.) Among many other provisions, it mandates that any warrant for electronic information "describe with particularity the information to be seized by specifying, as appropriate and reasonable, the time periods covered, the target individuals or accounts, the applications or services covered, and the types of information sought." (§ 1546.1, subd. (d)(1).)

Warrant Five authorized the government to seize the following information from Hsu's phone for the "time frame of June 2015 through May 26, 2016": (1) "All communications content and records, . . . email, text (SMS/MMS or app chats), notes, calendar or voicemail;" (2) "All location data;" (3) "All photographic/video/audio data;" (4) "All internet history;" (5) "All financial information;" (6) "All Social Media applications;" and (7) "All indicia of ownership and control for both the data and the device."

Hsu argues this description of items to be seized fails to satisfy any of CalECPA's particularity requirements. We consider his arguments in turn.

a.      *Time periods covered*

Hsu first argues Warrant Five fails to specify with particularity the "time periods covered." (§ 1546.1, subd. (d)(1).) He suggests the warrant provides "really no limitation at all" with respect to time. Alternatively, he argues the warrant lacks particularity because it is not limited to the time period "around the purported crime," and instead permits seizure of information dating back to the start of his relationship with L.U. in June 2015.

Hsu's suggestion that Warrant Five does not provide a time limitation "at all" is meritless; the warrant expressly limits the time period covered to "June 2015 through May 26, 2016." As to Hsu's other contention—that the time period is too long— his argument goes to the breadth of the limitation, rather than its particularity. (See *People v. Meza* (2023) 90 Cal.App.5th 520, 535–536 [breadth and particularity are distinct concepts].) Breadth concerns the scope of the warrant, while particularity concerns whether the warrant clearly states what is sought. (*Ibid.*; see Black's Law Dict. (11th ed. 2019) ["particularity" is the "quality, state, or condition of being both reasonably detailed and exact"].) Warrant Five's time period limitation is reasonably detailed and exact, such that the limitation would have been obvious to any officer executing the warrant. (See *Meza,* at p. 535 [a warrant is stated with particularity if an officer using reasonable effort can ascertain what is intended to be searched].) Accordingly, we reject Hsu's contention that Warrant Five fails to specify with particularity the time periods covered.

b.      *Target individuals and accounts*

Hsu argues Warrant Five fails to specify with particularity the "target individuals [and] accounts" because it does not expressly identify either.  The magistrate rejected this argument, reasoning that because the warrant concerns only Hsu's phone, there is an "obvious and reasonable understanding that [Hsu] is the individual targeted and that the accounts are his accounts."  We agree with the magistrate's reasoning and reject Hsu's argument for the same reason.

Hsu contends this reasoning is flawed because there is no exception to the particularity requirement when the owner of an electronic device is also the account holder.  True, section 1546.1 does not explicitly contain such an exception.  However, the statute states the warrant must specify the information with particularity only "as appropriate and reasonable."  (§ 1546.1, subd. (d)(1).)  Hsu points to nothing in the record that would have led a reasonable person to suspect his personal cellphone contained anyone else's information or accounts.  Nor does he contend his phone actually contained either.  Under these circumstances, it was reasonable for the government not to specify the targeted individuals and accounts, as both were already obvious and implied by the very nature of the search.

c.      *Applications or services covered*

Hsu argues Warrant Five fails to specify with particularity the "applications or services" covered.  He insists CalECPA requires the government to list each individual mobile application (app) it intends to search, such as "WhatsApp, Snapchat, Instagram, Facebook Messenger, etc."  According to Hsu, it was not enough for the government to identify the

15

categories of apps subject to seizure, such as "[a]ll Social Media applications."

The magistrate rejected this argument on the basis that it would have been impossible for the government to list each specific app it intended to search. We agree with the magistrate. According to Apple, there are "nearly two million" iPhone apps available in its app store. (Apple, App Store <https://www.apple.com/app-store/> [as of Dec. 20, 2023], archived at <https://perma.cc/T9Z7-QW5F>.) The government had no way to know which of those apps Hsu had installed on his phone without first looking through it. However, the government could not look through the phone without a search warrant. Therefore, in order to list the specific apps subject to seizure in Warrant Five, the government first would have had to obtain a separate search warrant limited to examining the names of the apps installed on Hsu's phone. This would have resulted in an enormous waste of resources, and there is nothing in the text or history of CalECPA to suggest it is what the Legislature intended.

Hsu insists the Legislature "made a plain and specific requirement" to list every application and service covered by the warrant, and to allow an exception for impossibility " 'ignore[s] [the statutory] language.' " (Italics omitted.) However, it is Hsu who ignores the statutory language. Section 1546.1 explicitly states the government is required to specify applications and services only "as appropriate and reasonable." (§ 1546.1, subd. (d)(1).) It is not reasonable to require the government to undertake a seemingly impossible task. Hsu does not acknowledge the "appropriate and reasonable" language, let alone explain how it is consistent with his interpretation.

16

For the first time in his reply brief, Hsu contends the government could have satisfied the particularity requirement by listing a handful of specific apps—he lists four—followed by a catchall provision permitting the search of "any app not accounted for on that list." We see no meaningful distinction between Hsu's suggestion and the approach the government took in Warrant Five, which was to identify "All Social Media applications."

d. *Types of information sought*

Hsu argues Warrant Five fails to specify with particularity the "types of information" sought. As we understand his argument, he contends it was not enough for the government to identify "photograph" and "video" files as the target of the search. Instead, according to Hsu, the government was required to list the specific file formats associated with those types of information, such as ".jpg, .png, and .mov." Hsu argues this level of specificity was necessary to limit the locations and types of documents the government could search. Without such specificity, he asserts, the government could search "every single piece of data on all locations of the phone."

As with Hsu's contention that the government was required to identify the specific applications it sought to search, it would seem to be an impossible task to list every possible file format associated with each type of information sought. Hsu points to nothing in CalECPA's text or legislative history to indicate the Legislature intended to require such an onerous level of specificity. Nor has Hsu shown that requiring a list of specific file formats would have constrained the discretion of the officer executing the warrant in a meaningful way. As best we can tell, Hsu seems to believe specific file formats are limited to specific

17

locations on a device. However, Hsu did not present expert testimony on the issue, and we are not aware of any such general limitations.

We also reject Hsu's alternative suggestion that Warrant Five violated section 1546.1, subdivision (d)(1) by prefacing each category of information with the word "all." Hsu's argument is essentially a challenge to the breadth of the warrant. However, section 1546.1, subdivision (d)(1) is concerned only with particularity. Hsu limited his argument to that specific statutory provision, and we decline to make additional arguments for him.[3]

## 3.     *The government did not violate CalECPA's notice requirements*

Hsu contends the government failed to comply with CalECPA's notice requirements.

a.     *Background*

CalECPA generally requires the government to provide a targeted individual notice of the warrant "contemporaneously with the execution of a warrant." (§ 1546.2, subd. (a)(1).) However, the government may request an order delaying notification for a reasonable period, not to exceed 90 days. (*Id.*, subd. (b)(1).) "The court shall issue the order if the court

---

[3]     In his reply brief, Hsu argues any purported limitations were nullified by a boilerplate statement found in the government's request for an extension of the time to conduct the search. The statement notes a "suspect may try to conceal criminal evidence; he might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files [are] evidence or instrumentalities of crime." We do not interpret this general statement to nullify the more specific limitations found elsewhere in the warrant.

18

determines that there is reason to believe that notification may have an adverse result." (*Ibid*.) CalECPA defines "adverse result" as (1) danger to the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; and (5) serious jeopardy to an investigation or undue delay of a trial. (§ 1546, subd. (a).)

In the affidavit attached to Warrant Five, the government requested an order delaying notice for 90 days. The government asserted the delay was necessary because "providing prior notice . . . may result in flight from prosecution; lead to destruction of or tampering with evidence; or otherwise seriously jeopardize an investigation or unduly delay a trial. Hsu is currently out of custody. Hsu has potential access to electronic communication devices, such as computers and cell phones, which could allow him to remotely locate his device listed above, disable it with a lock (also known as a 'kill switch'), and wipe any potential evidence stored on his cellular device. Hsu could potentially have other means or relations with an individual(s) who is technically well versed in electronic communication devices, such as iPhones like Hsu's listed above, who can assist him in wiping his iPhone."

The court granted the request and issued the warrant on October 19, 2017. The government provided notice to Hsu 68 days later, on December 26, 2017.

b. *Hsu misrepresents the magistrate's decision*

Hsu argues the magistrate refused to consider whether the government provided good cause for delayed notification. According to Hsu, the magistrate instead erroneously believed its role was limited to determining whether the government had requested delayed notification.

Hsu's contention is premised on a gross misrepresentation of the record. At the hearing on the motion to suppress, the magistrate noted it appeared the government had followed the statute by requesting and obtaining an order for delayed notification. The magistrate then asked Hsu if it had "miss[ed] something" from his argument. Hsu clarified his argument was that the "reasons for which [the government] requested [delayed notification] failed," noting if the government "had [the phone] for over two years, how are they still concerned with destruction of it, and can't give us proper notice?" The magistrate responded: "[I]t's reasonable because you can still potentially delete the evidence, and that is what their concern was. It didn't seem unreasonable."

It is readily apparent from this exchange that the magistrate considered, and rejected, the substance of Hsu's argument. Hsu's contention that the magistrate refused to do so is wholly without merit.

In another gross misrepresentation of the record, Hsu asserts the magistrate erroneously held the government was not required to comply with CalECPA's notice requirement because Hsu was aware it had seized his phone. While discussing the notice issue, the magistrate did briefly note Hsu was on notice that the government was in possession of his phone. However, the magistrate prefaced that statement by noting it was "a practical matter" and "less of a legal basis." The magistrate then discussed, in significantly more detail, the government's compliance with the statutory notice requirements. Given this context, no one could seriously claim the magistrate held Hsu's knowledge of the seizure was alone sufficient to satisfy CalECPA's notice requirement.

20

c.   *The government provided a sufficient basis for delayed notification*

Hsu contends the government's assertion he might flee if given contemporaneous notice of Warrant Five was "ridiculous on its face." He points to the fact that the government had executed prior warrants to search his property, yet he consistently appeared in court.

True, Hsu did not flee in response to prior warrants. However, when the government applied for Warrant Five, Hsu had received notice of only a single warrant to search his phone, which the government obtained in June 2016. According to Warrant Five, as of June 2016, law enforcement did not have the ability to bypass the security features of Hsu's model of iPhone. However, upon reading Warrant Five, Hsu would have learned that law enforcement had since discovered a way to bypass the security on his phone. That knowledge may have given him a new incentive to flee, especially if his phone contained particularly incriminating evidence.

Even if the risk of flight were insignificant, the government provided an additional reason for delayed notice: the risk that Hsu, or someone working on his behalf, could remotely lock or wipe his device.

Citing *Riley v. California* (2014) 573 U.S. 373 (*Riley*), Hsu contends the United States Supreme Court has already rejected the government's line of reasoning. In *Riley*, the high court held the Fourth Amendment generally requires police officers to obtain a warrant to search an arrestee's cell phone. (*Id.* at pp. 378, 381–386.) In doing so, the court rejected the State of California's argument that warrantless searches are necessary because of the risk a third party will remotely wipe the data

21

on the device.  (*Id*. at pp. 388–389.)  The court explained it had been given little reason to believe the problem was prevalent, it was not apparent a warrantless search would make a difference given the search is usually conducted hours after the arrest, and the government has other "specific means to address the threat," such as disconnecting the device from a network and placing it in a special bag designed to isolate it from radio waves.  (*Id*. at pp. 389–391.)

*Riley* is readily distinguishable.  That case involved the risk that a third party would remotely wipe a device shortly after the owner was taken into custody.  Here, in contrast, Hsu was out of custody, knew the government wanted to search his phone, and had several months to formulate a plan to wipe the device if the government turned it on.  Under these circumstances, the risk of data destruction was significantly greater than in *Riley*.

Hsu's reliance on *Riley* is misplaced for another reason.  The issue in *Riley* was whether the state's conduct violated the arrestee's Fourth Amendment rights.  To answer that question, the court balanced " 'the degree to which [a warrantless search of a phone] intrudes upon an individual's privacy' " against " 'the degree to which it is needed for the promotion of legitimate governmental interests.' " (*Riley, supra*, 573 U.S. at pp. 385–386.)  Here, the government's delayed notice does not implicate the Fourth Amendment, meaning we do not balance the competing interests.  Instead, we merely ask whether "there is reason to believe that notification may" lead to the destruction of evidence.  For the reasons discussed above, we conclude the government met this low standard.

d.    *The notice explained the reason for the delay*

For the first time in his reply brief, Hsu argues the government failed to include in the notice a statement of the reasons for the delay, as required under section 1546.2, subdivision (a)(1).

At the outset, Hsu forfeited this argument by failing to raise it in his opening brief.  (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218 [a defendant forfeited claims raised for the first time in a reply brief].)  Regardless, the argument lacks merit.

Hsu relies on language in section 1546.2, subdivision (a)(1) stating the government must provide the target "a copy of the warrant or a written statement setting forth facts giving rise to the emergency."  Hsu seems to believe the phrase "facts giving rise to the emergency" refers to the government's reasons justifying delayed notification.  He is wrong.  Even a cursory review of the statute makes clear the "emergency" language refers to situations where the government, without a warrant, "obtains electronic information in an emergency pursuant to Section 1546.1."  (*Ibid.*)

Nevertheless, Hsu is correct that the government was required to provide notice of the reasons for the delay.  Under section 1546.2, subdivision (b)(3), the government must provide the target of a warrant "a statement of the grounds for the court's determination to grant a delay in notifying the individual."  Here, the government included in an attachment to the warrant a paragraph stating the reasons the court granted its request to delay notice.  Hsu seems to concede the government served the warrant and the attachment on him.  Accordingly, he has not shown the government erred in this respect.

**4.** *There was probable cause to search Hsu's phone*

The government must support an application for a search warrant with an affidavit that establishes probable cause to issue the warrant.  (*People v. Carrington* (2009) 47 Cal.4th 145, 161.) To determine whether the government has met its burden, " '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' "  (*Ibid*.)

On review, the "magistrate's determination of probable cause is entitled to deferential review."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1041.)  "The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing."  (*Id*. at p. 1040.)

　　a.　　*The affidavit does not rely on unsupported conclusions*

Hsu contends the government failed to establish probable cause to search his phone because the affidavit relies on conclusory statements, rather than statements of fact.  Hsu identifies three specific statements that he argues lack the requisite factual support yet are crucial to demonstrating probable cause.  We consider each statement in turn.

　　　　i.　　MDMA is a date rape drug

First, Hsu contends the affidavit lacks factual support for the statement that MDMA "can . . . be used and [is] known as one of the 'date rape drugs.' "  Although Hsu does not distinguish

24

between them, the statement includes two distinct assertions: (1) MDMA can be used as a "date rape drug;" and (2) MDMA is known as a "date rape drug." Contrary to Hsu's contentions, the affidavit contains ample factual support for both assertions.

The affidavit does not expressly define "date rape drug." Nevertheless, its meaning can be inferred from the affidavit's detailed description of sexual predators who "assault their victims while they are incoherent." According to the affidavit, this type of perpetrator commits sexual assault typically by "supplying drugs secretly to a drink or through other means of intoxication. These drugs render the victim incoherent and allow[ ] the suspect to forcibly assault their victims with little to no resistance." From this, it is reasonable to infer the affidavit uses the term "date rape drug" to mean a drug that could be used to facilitate a sexual assault by rendering a victim incoherent.

Based on the affidavit's description of MDMA and its effects, it is reasonable to infer a perpetrator could use the drug to render a victim incoherent and facilitate a sexual assault. The affidavit states MDMA "falls into the drug category of [h]allucinogens," which is a group of drugs with "indicators" that include memory loss, nausea, disorientation, and poor perception of time and distance. As to MDMA, specifically, the affidavit asserts the drug causes the "enhancement of the senses," including "increased . . . responses to touch, smell and vision," and it affects "the mind of the user in a fashion that can render them incoherent." The affidavit also states L.U. experienced symptoms consistent with MDMA use, including euphoria, nausea, a desire to be touched, and memory loss. Based on this profile of MDMA—and particularly the fact it may cause memory loss, the desire to be touched, disorientation, and impaired

25

perception—it is reasonable to conclude the drug could be used to facilitate a sexual assault by rendering a victim incoherent, i.e., could be used as a "date rape drug."

As to the second assertion in the challenged statement—that MDMA is "known" as one of the "date rape drugs"—it is reasonable to infer the claim is based on the affiant's training and experience. According to the affidavit, the affiant worked as a police officer for seven years, during which time she investigated drug-related crimes and sexual assaults, received training on narcotics, and attended a seminar and conference focused on sexual assault issues. The affiant's extensive history with narcotics and sexual assault provided a sufficient basis for her to make the assertion that MDMA is "known" as one of the "date rape drugs."

ii.     Risk of death or health risks

Hsu argues the affidavit lacks any factual support for the assertion there is a "*risk of death or health risks with [MDMA] use.*" We disagree. As discussed above, the affidavit describes several serious effects of MDMA and the category of drugs to which it belongs. It is not unreasonable to conclude some of those effects—such as disorientation, altered perception, and memory loss—might cause health risks or potentially death.

Even if the factual support for the statement were insufficient, Hsu has not shown Warrant Five lacked probable cause without it. As the magistrate explained in quashing Warrant Two, the key to establishing probable cause was establishing a link between MDMA and sexual assault. Whether there are health risks associated with MDMA use is not relevant to that issue, something Hsu seems to acknowledge on appeal. The affidavit's general statement concerning the health risks

26

of MDMA use, therefore, was irrelevant to the magistrate's probable cause determination.  Accordingly, there is no risk the inclusion of the challenged statement was the basis for the magistrate's decision to issue the warrant.

           iii.     Perpetrators' preference not to be without photographic evidence

Hsu challenges the affidavit's assertion that "[p]erpetrators of sexual assault prefer not to be without their photographic evidence [of the assaults] for any prolonged time period." According to Hsu, the affidavit improperly attributes this conclusion to the observations of "officers involved in the investigation of sexual assault throughout the world."  Hsu insists this is equivalent to claiming " 'everybody says so' " as justification for a significant assertion.

Assuming for the sake of argument Hsu is correct, he has not shown the warrant lacked probable cause without the challenged statement.  In the same paragraph of the affidavit, the affiant states that, based on her "training and experience," those who have an interest in sexual activity of inebriated persons will "maintain images depicting their victims secreted, but readily at hand."  This conveys essentially the same information as the challenged statement.  However, Hsu does not argue the affiant's statement is conclusory, lacks factual support, or is otherwise improper.  Accordingly, even without the challenged statement, the magistrate would have been presented with essentially the same information. Suppression is not required under these circumstances.

      b.     *The affidavit links Hsu to the offender profile*

Hsu argues the affidavit lacks probable cause because it fails to link him to the profile of a typical sexual assault offender.

According to Hsu, the affidavit describes a profile of "a person who drugs a victim to unconsciousness because of a sexual interest in incoherent victims." He asserts it is not reasonable to infer he is a member of that class because the affidavit "provides no facts that the complaining witness was ever rendered unconscious or incoherent on MDMA, or sexually assaulted while in an unconscious state."

Hsu's argument is based on a faulty premise: that the affidavit describes a typical offender as someone who "drugs a victim to unconsciousness." As best we can tell, Hsu arrives at this conclusion by conflating the words "incoherent" and "unconscious." For example, where the affidavit states the "drugs render the victim *incoherent* and allow[ ] the suspect to forcibly assault their victims with little to no resistance" (italics added), Hsu interprets it to mean the "drugs render the victim [*unconscious*] and allow[ ] the suspect to forcibly assault their victims with little to no resistance." As the trial court explained in rejecting a similar argument, "incoherent" and "unconscious" are not synonyms. Nor do we think any reasonable person would interpret the affidavit in the way Hsu suggests.

In his reply brief, Hsu briefly acknowledges that incoherent and unconscious might have different meanings, depending on context. Citing dictionary.com, he states it is "[c]ertainly" true that " 'incoherent' " can modify the word " 'speech,' " in which case it would convey that the person's "speech was incomprehensible." Hsu then asks this court to consider whether, in drafting the affidavit, the affiant believed "that typical offenders were exploiting women by taking pictures of victims who were unconscious or by taking pictures of persons who were speaking in a modified manner?"

28

In making this argument, Hsu overlooks—or, perhaps, purposefully omits—dictionary.com's actual definitions for "incoherent." The online dictionary provides eight definitions for the word, none of which resembles "unconscious." One of the top definitions is "characterized by . . . thought or language [lacking logical or meaningful connection]." (Dictionary.com <https://www.dictionary.com/browse/incoherent> [as of Dec. 20, 2023], archived at <https://perma.cc/G8HX-HABR>.) It is reasonable to infer the affidavit uses the word in this manner when it repeatedly describes the typical offender as a person who sexually assaults incoherent victims.

Hsu asserts the affiant's true intention is revealed by two sentences in the affidavit that contain the word "unconscious." First, the affidavit states Hsu's phone may contain photographs of L.U. and other victims "while they were unconscious or after they had been drugged by Hsu, unbeknownst to them." A few paragraphs later, it states "[i]ndividuals who sexually assault females, especially those that are rendered incoherent/unconscious due to the intake of illegal narcotics . . . may receive sexual gratification . . . viewing unconscious women engaged in sexual activity . . . ."

We do not agree with Hsu that these sentences make clear the affiant mistakenly used the word "incoherent," rather than "unconscious," throughout the affidavit. If anything, it seems more reasonable to presume the affiant mistakenly used the word "unconscious" when she meant to say "incoherent."

Hsu is also wrong to claim the affidavit lacks probable cause because it provides no facts showing L.U. was incoherent or sexually assaulted while under the influence of MDMA. Hsu overlooks that the affidavit states facts indicating L.U. suffered

memory loss after ingesting MDMA.  If so, she may not recall having been incoherent or sexually assaulted.  Accordingly, the affidavit's lack of direct evidence that L.U. was incoherent or sexually assaulted is not determinative.

5.    ***Hsu forfeited the unlawful possession issue; it also lacks merit***

Hsu argues the evidence seized from his phone must be suppressed because the government did not have lawful possession of the phone when it conducted the search.  He asserts that, after the court granted his motion to suppress evidence seized under Warrant Two, the government was required to return his phone within 10 days.  Hsu relies on section 1538.5, subdivision (e), which states, if a motion to suppress "is granted at a preliminary hearing, the property shall be returned upon order of the court after 10 days unless the property is otherwise subject to lawful detention or unless, within that time, further proceedings authorized by this section . . . are utilized."

The Attorney General asserts Hsu forfeited this argument by failing to raise it below.  We agree.  In his motion to suppress, Hsu made a few passing remarks about the government's refusal to return his phone.  However, he did not specifically argue the government's possession violated section 1538.5 or that it was otherwise unlawful.  Hsu did explicitly make that argument in his section 995 motion.  However, on appeal, we review the magistrate's order denying Hsu's motion to suppress, not the superior court's order denying his section 995 motion. (*McDonald, supra*, 137 Cal.App.4th at p. 529.)  Therefore, to preserve the issue, Hsu was required to raise the specific argument in his motion to suppress.  His failure to do so forfeits

30

the issue on appeal.  (See *People v. Lilienthal* (1978) 22 Cal.3d 891, 896 ["it would be wholly inappropriate to reverse a superior court's judgment for error it did not commit and that was never called to its attention"]); *People v. Partida* (2005) 37 Cal.4th 428, 435 (*Partida*) ["[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct"].)

Hsu contends he preserved the issue by raising it orally at the hearing on his motion to suppress.  Tellingly, Hsu does not support that assertion with a citation to the reporter's transcript from the hearing.  Instead, he cites the transcript of the hearing on his section 995 motion.  In our independent review of the relevant transcripts, we found no references to section 1538.5 or specific arguments that the government's retention of the phone was unlawful.

Even if we were to overlook the forfeiture, we would reject Hsu's argument on the merits.  Section 1538.5 does not require the government to return property sua sponte.  Instead, the government must return the property only "upon order of the court."  (§ 1538.5, subd. (e).)  As Hsu seems to concede, after the court granted his motion to suppress, it deferred ordering the government to return his phone.  As best we can tell, the court never revisited the issue and Hsu never pressed it to do so.  Absent an "order of the court," the government's retention of the phone did not violate section 1538.5, subdivision (e).

**6.    *Hsu forfeited the unreasonable delay issue; it also lacks merit***

Hsu argues the government unreasonably delayed obtaining Warrant Five, which violated his Fourth Amendment rights.

31

Once again, we agree with the Attorney General that Hsu forfeited this issue by failing to raise it in his motion to suppress. (*Partida, supra*, 37 Cal.4th at p. 435.)  In any event, the argument lacks merit.

To determine whether the government's retention of property without a warrant was unreasonable, we "balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " (*United States v. Sullivan* (9th Cir. 2015) 797 F.3d 623, 633.) "Seizures, which affect a person's possessory interest in an item, are less intrusive than searches, which implicate a person's privacy interests."  (*People v. Tousant* (2021) 64 Cal.App.5th 804, 816 (*Tousant*).)

Before considering the merits of Hsu's argument, we address another instance in which he entirely mischaracterizes the record.  Hsu contends that, instead of balancing the relevant interests, the magistrate erroneously held CalECPA "specifically allows the government to circumvent the Fourth Amendment and retain and search electronic devices repeatedly and indefinitely." The magistrate did nothing of the sort.  While discussing the fact that the "phone has been retained for several years," the magistrate explained that, if the government "properly retain[s] a phone," CalECPA allows it to "go back and continue to get a warrant until they do it right."  In other words, CalECPA allows the government to seek successive warrants so long as it "properly retain[s]" the property to be searched.  The magistrate did not hold, in any way, that CalECPA allowed the government to circumvent the Fourth Amendment and retain Hsu's phone indefinitely.

Turning to the merits of Hsu's argument, we conclude the government's retention of his phone was not unreasonable. Although Hsu initially requested an order returning his phone, the court deferred ruling on the issue. Hsu did not object, press the court to issue a ruling, or seek a writ directing the court to do so. Instead, he simply requested the court allow a special master to search the device. By failing to object or press the court for a ruling, Hsu effectively conceded the government could continue to possess his phone. At the very least, it strongly indicates his interest in regaining possession of the phone was minimal. (See *Tousant, supra*, 64 Cal.App.5th at pp. 816–817 [noting a defendant's possessory interests are not adversely affected where he does not seek return of the seized property].)

In contrast, the government had a significant interest in retaining the phone. The government had probable cause to believe Hsu's phone contained evidence of sexual assaults. Given Hsu's suspected modus operandi, the government also had reason to believe his victims were not aware of the crimes. However, the government was unable to bypass the phone's security in order to search it. If the government had returned the phone to Hsu, he easily could have destroyed any evidence of his criminal activity contained in it. Under these circumstances, the government had a significant interest in retaining the phone. Weighed against Hsu's minimal interest, the government's retention was reasonable and not a violation of Hsu's constitutional rights.

### 7. *Hsu has not shown Warrant Five relies on suppressed evidence*

Hsu argues the affidavit relies on suppressed evidence when it states L.U. "had memory loss and no recollection of Hsu

and her kissing in public at one of their concert outings.  Hsu had shown [L.U.] photographs and/or videos of them engaging in such intimate behavior, which surprised [L.U.]."

a.    *Background*

Although Hsu did not raise it in his motions, at the preliminary hearing, the magistrate asked the parties to address whether Warrant Five relied on previously suppressed evidence by referring to photographs of L.U. and Hsu kissing.  The magistrate expressed concern that the government may have obtained the photographs from Hsu's computer while executing Warrant Two.

The People filed a supplemental brief responding to the magistrate's concerns.  According to the People, L.U. told a detective she saw the photographs before Hsu's arrest and before the police searched his computer.  Hsu did not respond to the People's brief.

L.U. testified at the preliminary hearing a few days later. According to L.U., the photographs in which she and Hsu were kissing were a "little out of the norm" for her.  In response to Hsu's questions on cross-examination, L.U. said a detective showed her the photographs on a computer and claimed they were recovered from Hsu's phone.  On redirect, the prosecutor asked L.U. if she had ever seen the photographs before meeting with the detective.  L.U. responded:  "I think I may have seen some of the photos . . . .  I don't recall specific instances, but [Hsu and I] have looked at photos . . . ."

After L.U. testified, Hsu filed a supplemental brief arguing Warrant Five relies on previously suppressed evidence. According to Hsu, L.U.s testimony established the photographs

of her kissing Hsu "must have come" from a device the police seized and searched under Warrant One and Warrant Two.

The magistrate addressed the issue at a subsequent hearing. It noted that Hsu was "able to elicit from the victim that her current recollection is the only time she saw [the photographs] was from the detective, but she too was—that was qualified. Some time has passed." The magistrate stated the issue did not affect its decision to deny Hsu's motions one way or the other.

b. *Analysis*

Hsu contends L.U.'s preliminary hearing testimony establishes that Warrant Five relies on suppressed evidence. He argues "*the only* photographs [the detective] could have shown [L.U.] were those recovered pursuant to Warrants One and Two, which had been quashed and all evidence suppressed." The only other explanation, Hsu contends, is that L.U. lied at the preliminary hearing.

Contrary to Hsu's contention, those are not the only possible explanations for L.U.'s preliminary hearing testimony. For example, L.U. may have simply misremembered how she came to see the photographs. Indeed, in connection with Hsu's section 995 motion, the prosecutor presented evidence that L.U. saw the photographs sometime before Hsu's arrest. The prosecutor's evidence was so overwhelming, in fact, that Hsu later remarked it had "become clear" L.U. was not talking about photographs taken from his computer. Considering this apparent concession, we question why Hsu continues to contest the issue on appeal.

Even if we ignored the evidence presented at the section 995 hearing and Hsu's apparent concession, we would still reject

his argument. Assuming L.U.'s preliminary hearing testimony were accurate—in which case the detective showed her the photographs—it does not follow that the photographs must have come from Hsu's computer. Indeed, it is possible the detective obtained the photographs through some other lawful channel. Given this possibility—for which Hsu does not account—we reject his insistence that the "photographs could have only come from the suppressed evidence."

8.      ***The affidavit does not contain material misstatements and omissions***

        "[A] defendant may challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. When presented with such a challenge, the lower courts must conduct an evidentiary hearing if a defendant makes a substantial showing that: (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to justify a finding of probable cause. At the evidentiary hearing, if the statements are proved by a preponderance of the evidence to be false or reckless, they must be considered excised. If the remaining contents of the affidavit are insufficient to establish probable cause, the warrant must be voided and any evidence seized pursuant to that warrant must be suppressed." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1297 (*Bradford*).)

        "A defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that the omissions were material to the determination of probable cause. [Citation.] 'Pursuant to section 28(d), materiality is evaluated by the test of *Illinois v. Gates* (1983)

36

462 U.S. 213, which looks to the totality of the circumstances in determining whether a warrant affidavit establishes good cause for a search. [Citation.]' [Citation.]" (*Bradford, supra*, 15 Cal.4th at p. 1297.)

Hsu argues Warrant Five contains four categories of material misstatements and omissions. We consider each category in turn.

a. *MDMA's effects*

Hsu challenges the affidavit's assertion that "MDMA is a Schedule I drug under the Controlled Substances Act and *there is a risk of death or health risks with use*." According to Hsu, the statement is false because the federal government does not classify drugs based on their health risks. Instead, the government classifies a drug as "Schedule I" if it has no currently accepted medical uses and poses a high potential for abuse.

Contrary to Hsu's insistence, the affidavit does not state MDMA is a Schedule I drug *because* there is a risk of death or health risks with use. Nor do we think a reasonable magistrate would interpret the statement in the way Hsu suggests. Accordingly, we reject his argument.

Hsu next argues the affidavit misleadingly suggests MDMA has the same indicators as other hallucinogens. He contends the affidavit should have listed only those effects the People's drug expert, Jason Olson, identified at the first preliminary hearing.[4] Olson testified that MDMA may affect the user's

_____

[4] Hsu insists the affidavit should have mirrored Olson's testimony because it purports to be a summary of it. Not so. The affidavit states the affiant spoke with Olson regarding MDMA and he "provided [the affiant] with an in depth explanation of his opinions and suspicions regarding the overall

speech, coordination, memory, and body temperature, and it may cause dehydration and goose bumps.

Hsu points to no direct evidence that MDMA does not share the same indicators as other hallucinogens. Instead, he simply assumes Olson testified to an exhaustive list of MDMA's effects. The record, however, belies that assumption. At the second preliminary hearing, the People presented testimony from a different drug expert, Trinka Porrata, who identified several effects of MDMA that Olson had not. Those effects include panic attacks, exhaustion, elevated heart rate, "twisted" senses, impaired ability to resist, and "terrible spasms." Because these effects generally resemble the indicators of hallucinogens listed in the affidavit, we reject Hsu's argument that the affidavit is misleading in this respect.

Hsu alternatively contends the affidavit improperly omits Olson's preliminary hearing testimony that MDMA "mirrors a stimulant." Hsu asserts that, because stimulants usually increase wakefulness and movement, a stimulant "would not be a drug that would render its user incoherent."

Hsu's argument seems to be premised on his belief that "incoherent" is synonymous with "unconscious." For the reasons we discussed in detail above, we disagree. Absent that faulty presumption, there is no merit to Hsu's argument.

b.    *MDMA is a date rape drug*

Hsu argues there is nothing in the literature, law, or expert testimony to support the affidavit's statement that MDMA

---

circumstances of this case." From this, it is clear the affidavit reflects information Olson conveyed to the affiant directly; it does not simply summarize his preliminary hearing testimony.

38

is a "date rape drug." In support, he cites a U.S. Department of Health & Human Services (HHS) webpage, which states the three most common "date rape drugs" are Rohypnol (flunitrazepam), gamma hydroxybutyric acid (GHB), and ketamine. (Office on Women's Health, U.S. Dept. Health & Human Services, Date Rape Drugs (May 22, 2018) <http://web.archive.org/web/20180728010337/https://www.womenshealth.gov/a-z-topics/date-rape-drugs> [as of Dec. 21, 2023], archived at <https://perma.cc/H5HU-WD6G> (HHS webpage).) Hsu also asserts federal law defines "date rape drug" to mean flunitrazepam, GHB, and ketamine. (See 21 U.S.C. § 841(g)(2)(A).)

Despite accusing the government of omitting relevant information in order to paint a misleading picture, Hsu engages in similar tactics himself. For example, Hsu does not mention the HHS webpage defines "date rape drugs" as "drugs that are sometimes used during sexual assault." Nor does he mention the webpage explicitly states MDMA "has been used to commit sexual assault. It can be slipped into someone's drink without the person's knowledge." (HHS webpage.) In other words, Hsu's own source seems to support the affidavit's assertion that MDMA is a "date rape drug."[5]

---

[5] In a footnote, Hsu acknowledges the HHS webpage states MDMA use can inhibit the ability to give reasoned consent and place an individual at greater risk of sexual assault. However, he suggests that fact is irrelevant because the webpage does not specifically state MDMA is a " 'date rape' drug which renders the victim unconscious." True, the webpage does not claim MDMA can render a victim unconscious. However, neither does the affidavit.

Also misleading is Hsu's suggestion that federal law provides an exhaustive list of "date rape drugs." It does not. The statute states that, in addition to flunitrazepam, GHB, and ketamine, the term " 'date rape drug' " includes "any substance which the Attorney General designates . . . to be used in committing rape or sexual assault." (21 U.S.C. § 841(g)(2)(A).) Although it does not appear the Attorney General has designated MDMA to be a "date rape drug," based on the information in the record concerning its effects, it would not be unreasonable to designate it a "substance . . . to be used in committing rape or sexual assault."

Hsu also wholly ignores Porrata's testimony on the issue.[6] At the second preliminary hearing, Porrata defined "date rape drugs" as drugs used "for the purpose of committing . . . drug-facilitated sexual assault." She testified it is a "myth" that there are only three such drugs. Instead, according to Porrata, more than 50 drugs have "been identified and used in this manner," including MDMA.

Considering the ample evidentiary support for the affidavit's characterization of MDMA as a "date rape drug"—including from one of Hsu's own sources—we reject Hsu's argument that the affidavit misstated or omitted material information on the issue.

---

[6]    We reject Hsu's suggestion that, because the affiant drafted the affidavit before the second preliminary hearing, Porrata's testimony is irrelevant. As Hsu acknowledges, the question before us is whether the affidavit makes material misrepresentations or omissions concerning MDMA's status as a "date rape drug." Porrata's testimony is directly relevant to that issue.

c.     *The quantity of MDMA in L.U.'s wine glass*

Hsu argues the affidavit improperly omits the fact that L.U.'s wine glass contained roughly 16.95 milligrams of MDMA. He argues this information is crucial because 16.95 milligrams are not enough to render someone "unconscious or incoherent." In support, Hsu relies entirely on Olson's testimony that recreational MDMA users often recommend 120 milligrams as a safe first-time dose of the drug.

In making this argument, Hsu simply ignores the fact that police discovered two additional vials of MDMA in his pocket. From this, it is reasonable to infer Hsu intended to administer more MDMA to L.U. If so, the fact that L.U.'s glass contained a relatively small amount of MDMA is largely irrelevant.

Even if we were to assume Hsu did not intend to administer more MDMA to L.U., his argument still fails. In relying on Olson's testimony, Hsu assumes the dose required to facilitate a sexual assault is the same as the dose required for recreational use. That assumption is not well founded. Porrata testified that a typical dose of MDMA is in the range of 50 to 150 milligrams, "but we see lower doses needed in sexual assault." In fact, Porrata explained that a high dose of MDMA could be counter-productive for facilitating a sexual assault because it may cause increased energy and activity. Considering this testimony, the fact that L.U.'s glass contained less than a recreational dose of MDMA would seem to support—rather than refute—the government's suspicion that Hsu's goal was sexual assault. Accordingly, we reject Hsu's contention that the government's omission was material or intended to mislead the magistrate.

41

d. *Disclosure of the previously quashed warrants*

Hsu argues the government made material misrepresentations and omissions concerning the fact that a court previously quashed Warrant One and Warrant Two. The trial court rejected this argument, explaining that, "while it is disturbing that the affiant failed to disclose to the magistrate that this Court granted a motion to quash a previous warrant, even when factoring in this omitted information, probable cause still existed for authorizing the search."

Hsu does not directly address the court's reasoning. Instead, he simply accuses the government of strategically omitting the information to hide the fact that it made only superficial additions to Warrant Five that failed to correct the deficiencies with Warrant Two. According to Hsu, the government "shopp[ed] for a judge (while failing to notify those judges of what else was occurring) that would allow the government to do what they had been unsuccessfully trying to do for over two years—use the purported poisoning in a restaurant in Santa Monica to search Mr. Hsu's electronic devices."

To the extent Hsu is suggesting the government spent two years "shopping for a judge" who would sign a search warrant, his argument finds no support in the record. The delay in completing the search was the result of the government's inability to bypass the phone's security; it had nothing to do with the government's difficulty obtaining a warrant. The government seized Hsu's phone in May 2016 and completed its search sometime around December 2017. During those 19 months, three different magistrates issued warrants to search the phone.

42

Equally meritless is Hsu's suggestion that the government made only superficial additions to Warrant Five. The affidavit supporting Warrant Five is eight pages longer than the affidavit supporting Warrant Two. Those additional pages directly address the deficiencies with Warrant Two by providing significant new details concerning the effects of MDMA, the characteristics of sexual assault perpetrators, and the reasons to suspect Hsu used MDMA to facilitate a sexual assault. Indeed, the same judge who quashed Warrant Two found Warrant Five is "much more detailed" and "contains significant facts" that address Warrant Two's deficiencies. While we share the court's concern that the government did not disclose the quashed warrants, we also agree it does not necessitate granting Hsu's motion to suppress.

## DISPOSITION

We affirm the order.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P.J.                    LAVIN, J.

43